UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| MOTORS LIQUIDATION COMPANY, | ) | |
|     f/k/a General Motors Corp., *et al.*, | ) | Case No. 09-50026 (REG) |
| | ) | |
|     Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |
| JOHN MORGENSTEIN, MICHAEL JACOB, | ) | |
| as Executor of the Estate of Doris Jacob, | ) | |
| and ALANTE CARPENTER individually | ) | |
| and on behalf of all others similarly situated, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| v. | ) | Adversary Proceeding |
| | ) | |
| MOTORS LIQUIDATION COMPANY, | ) | Case No. 11-9409 (REG) |
|     f/k/a General Motors Corp., *et al.*, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

DECISION AND ORDER ON MOTION TO DISMISS

APPEARANCES:

LAW OFFICES OF MARK SCHLACHET
*Counsel for the Plaintiffs*
3637 South Green Road
Beachwood, Ohio 44122
By:    Mark Schlachet, Esq.  (argued)

CLIMACO, WILCOX, PECA, TARANTINO & GAROFOLI, CO.
*Counsel for the Plaintiffs*
55 Public Square, Suite 1950
Cleveland, Ohio 44113
By:    John R. Climaco, Esq.
        John A. Peca, Esq.
        Patrick G. Warner, Esq.

NEBLETT, BEARD & ARSENAULT
*Counsel for the Plaintiffs*
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71309
By:     Richard J. Arsenault, Esq.
        Srivatsa V. Gupta, Esq.

SIPRUT PC
*Counsel for the Plaintiffs*
122 South Michigan Avenue, Suite 1850
Chicago, Illinois 60603
By:     Joseph J. Siprut, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC
*Counsel for the Plaintiffs*
55 West Monroe Street
Chicago, Illinois 60603
By:     Edmund Aronowitz, Esq.
        Adam J. Levitt, Esq.

WEIL GOTSHAL & MANGES, LLP
*Counsel for the Defendants*
767 Fifth Avenue
New York, New York 10153
By:     Joseph H. Smolinsky, Esq.
        Angela C. Zambrano, Esq.  (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In the chapter 11 case of reorganized Debtor Motors Liquidation Company,

(formerly known as General Motors Corp.) ("**Old GM**") and its affiliates (collectively,

the "**Debtors**"), John Morgenstein, Michael Jacob and Alante Carpenter (the

"**Morgenstein Plaintiffs**"), on their own behalf and on behalf of a class they would like

to represent, seek—after the deadline for filing claims in Old GM's chapter 11 case and

after Old GM's reorganization plan became effective—to file and recover on a class

proof of claim, whose assertion now would now be barred under the Debtor's

reorganization plan (the "**Plan**")[1] and confirmation order ("**Confirmation Order**").  The

class proof of claim would be in the estimated amount of approximately $180 million, for

the estimated costs of a fix on 400,000 class members' 2007 and 2008 Chevrolet Impalas,

which the Morgenstein Plaintiffs allege had a design defect in the spindle rods that linked

to the Impalas' rear wheels.[2]

In this adversary proceeding,[3] brought under the umbrella of the reorganized

Debtors' chapter 11 case, the Morgenstein Plaintiffs "seek a limited revocation of the

---

[1]    More technically, the Plan was a plan of liquidation, which is of some significance for several
reasons, discussed at page 17 and n.5 below.  See this Court's March 2011 decision, *In re Motors
Liquidation Co*., 447 B.R. 198, 202-204 (Bankr. S.D.N.Y. 2011) (the "*Confirmation Decision*"),
addressing objections to confirmation of the Plan.

[2]    That figure is the product of the estimated 400,000 class members, and an estimated $450 per car
to make the allegedly necessary corrections.  The claims are for the cost of repair and replacement
only; they do not involve claims of personal injury.  The Morgenstein Plaintiffs have not, to the
Court's knowledge, waived the right to seek additional or different types of damages, but for the
purposes of this analysis the Court uses the $180 million figure as the best available estimate of
the size of the prospective claim and the stakes of the motion for Old GM's unsecured creditor
community.

[3]    The separate adversary proceeding here was required under Fed.R.Bankr.P. 7001, laying out the
matters for which an adversary proceeding must be commenced, which include "a proceeding to
revoke an order of confirmation of a chapter 11, chapter 12, or chapter 13 plan." Fed.R.Bankr.P.
7001(5).

1

confirmation order,"[4] under section 1144 of the Bankruptcy Code, allegedly for fraud on

this Court in procuring the Confirmation Order.[5]  As stated in paragraph 1 of their

Complaint:

> The Plaintiffs bring this action for limited, carefully
> crafted plan revocation based upon the Debtors'
> fraud in the chapter 11 Schedules and in the
> procurement of a bankruptcy confirmation order.[6]

Similarly, as stated in paragraph 53 of their Complaint:

> Based on the facts laid out above, the Plaintiffs
> request that the Court revoke the Debtor's
> confirmation order on the grounds that it was
> procured by fraud provided, however, that the
> revocation shall go only to the denial of discharge
> as to Known Creditors' class claim, *i.e.*, leaving any
> and all events, transfers and transactions wholly
> unaffected by the Order of Revocation of Discharge
> as to the Claims of Consumer Impala Owners.

Old GM and the Motors Liquidation Company GUC Trust (the "**GUC Trust**,"[7]

which is the successor to most of Old GM's remaining assets under the Plan) move,

---

[4]    Cmplt. at 1.

[5]    Their complaint is captioned "Complaint for Revocation of Discharge."  But while it was named
as such, it is not really that, nor could it be.  There is no discharge upon confirmation of a
corporation's liquidating plan of reorganization, *see* Code section 1141(d)(3), and there was no
discharge here.

[6]    They continue:

> In their schedules and disclosure statement (the "Chapter 11
> Documents"), the Debtors falsely omitted disclosure of its
> obligations to an entire class Impala Owners/Lessees
> (hereinafter 'Impala Owners')  Debtors knew of this class of
> creditors ("Known Creditors").  Known Creditors knew
> nothing of Debtors' obligation to address their claims because
> the design defect in their respective vehicles was a latent
> defect of which GM gave no notice.

*Id.* (errors in original).

[7]    "GUC" is an acronym for "General Unsecured Creditors," who were and will be the principal
recipients of consideration under the Plan, and who would be most affected by granting the relief
that the Morgenstein Plaintiffs seek.  To avoid the need to use the unhelpful term "Defendants," or
to say both Old GM and the GUC Trust each time, the Court will normally speak as if the GUC
Trust is the only defendant.

under Fed.R.Civ.P. 12(b)(6) and 9, to dismiss the Complaint. They contend, among other things, that there's no such thing as a partial revocation of a confirmation order; there's been a failure to satisfactorily allege a fraud on the Court, much less with the particularity that Fed.R.Civ.P. 9 requires; and that even if the Complaint otherwise had merit, it would be barred by the doctrine of equitable mootness.

The Court now agrees with the first two of those contentions (concluding that the third would better be addressed on summary judgment), and especially the first—upon which the Complaint fails as a threshold matter. The Complaint will be dismissed.

<u>Facts</u>

Under familiar principles, the Court takes the well-pleaded[8] facts from the Complaint (and its single exhibit), and from prior proceedings in Old GM's chapter 11 case of which the Court can take judicial notice.

The Morgenstein Plaintiffs[9] are three individuals who own Chevrolet Impalas from model years 2007 and 2008. They allege that due to "excessive and premature wear

---

[8]     However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009) ("*Iqbal*") (internal citations and quotation marks omitted). Similarly, the Court is not bound to accept as true conclusory factual allegations that are devoid of evidentiary support. "[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *Mason v. American Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (internal quotation marks omitted); *In re Spiegel, Inc.*, 354 B.R. 51, 56 (Bankr. S.D.N.Y. 2006) (Lifland, C.J.) ("*Spiegel*"), *aff'd and appeal dismissed*, 2007 WL 656902 (S.D.N.Y. 2007) (Buchwald, J.), *aff'd by summary order*, 269 Fed. Appx. 56 (2d Cir. 2008), *cert. denied*, 555 U.S. 825 (2008).

[9]     The Court does not need to, nor does it, burden the discussion with the factual allegations relevant only to the Morgenstein Plaintiffs' request for class certification under Fed.R.Civ.P. 23. Though the propriety of class certification is hotly debated, the Court assumes, for the purposes of this analysis only, that the Morgenstein Plaintiffs could successfully achieve class certification and establish the very major liability that would result from the allowance of a class proof of claim.

and tear, caused by Defendant's conduct,"[10] the rear-wheel tires on their Impalas had to be replaced.[11]

Defendant Old GM filed for chapter 11 protection on June 1, 2009.[12]  On July 5, 2009, the Court granted Old GM's motion, under section 363 of the Code, for an order authorizing the sale of most of Old GM's assets to a newly formed corporation ("**New GM**"), financed by the United States Treasury.[13]  Through an order entered on September 16, 2009, the Court set a bar date—the last date by which to file a claim against Old GM—as November 30, 2009.[14]  By decision dated March 7, 2011,[15] the Court overruled the handful of objections to confirmation of the Debtor's Plan, and an order confirming the Debtor's reorganization plan was entered on March 29, 2011.[16]

The Morgenstein Plaintiffs allege that 2007 and 2008 Impalas have defective rear wheel spindle rods that cause "excessive, abnormal, and premature"[17] wear to the vehicles' rear tires.  Additionally, they allege that Old GM "knew of the defective rear wheel spindle rods in the Impalas generally,"[18] but took steps to remedy the defect only in Impalas equipped with a police package (the "**Police Package Impalas**").  The

---

[10]   Cmplt. ¶ 25.

[11]   For example, Mr. Morgenstein's rear-wheel tires allegedly had to be replaced "after only approximately 28,000 to 30,000 miles and will again require replacement after only another 15,000 miles."  *Id.*

[12]   *See* docket in underlying chapter 11 case, #09-50026 ("**Umbrella Case**"), ECF #1.

[13]   *See In re General Motors Corp.*, 407 B.R. 463 (Bankr. S.D.N.Y. 2009) (the "*363 Sale Decision*"), *stay pending appeal denied*, 2009 WL 2033079 (S.D.N.Y. 2009) (Kaplan, J.), *appeal dismissed and aff'd*, 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.) and 430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.), *appeal dismissed*, No. 10–4882–bk (2d Cir. Jul. 28, 2011).  *See also* Umbrella Case ECF #2968 (363 Sale Order).

[14]   Umbrella Case ECF #4079.

[15]   *See Confirmation Decision*, n.1 *supra*.

[16]   Umbrella Case ECF #9941.

[17]   Cmplt. ¶ 3.

[18]   Cmplt. ¶ 4.

Morgenstein Plaintiffs further allege that "[t]here are no material differences between the rear wheel spindle rods installed and equipped in Police Package Impalas and the rear wheel spindle rods installed and equipped in Impalas without a police package."[19]

The Morgenstein Plaintiffs allege that Old GM issued two notices in 2008 relating to the defect in the Police Package Impalas. First, they allege, Old GM issued "Technical Service Bulletin 09032, National Highway Transportation Safety Administration ('NHTSA') Item Numbers 10026504 and 10026484,"[20] which noted that "conditions on Impalas equipped with a 'police package' result in lower tread depth on the inboard side of the rear tires or uneven rear tire wear."[21] Second, they allege, "in or about June and July 2008, [Old GM] issued a bulletin [the "**Program Bulletin**," attached as Exhibit A to the Complaint] as part of its customer satisfaction program directing GM dealers to replace the rear wheel spindle rods, align the rear wheels, and replace rear tires if they had insufficient tread depth on the inboard side"[22] for Police Package Impalas only.

The Program Bulletin referenced by the Morgenstein Plaintiffs is dated July 2008. The Program Bulletin first describes the "Condition":

> On **certain** 2007-2008 model year Chevrolet Impala vehicles equipped with a police package (RPO 9C1/9C3), the rear wheel spindle rods may cause rear wheel misalignment, resulting in lower tread depth on the inboard side of the rear tire.[23]

The Program Bulletin then outlines the steps dealers should take to remedy the defect and the payment procedures for the program. Under a section labeled "Customer Notification

---

[19]     Cmplt. ¶ 10.

[20]     Cmplt. ¶ 5.

[21]     *Id.*

[22]     Cmplt. ¶ 4.

[23]     Exhibit A, "Condition" (emphasis in bold in original).

– For US and Canada,"[24] the Bulletin states that "General Motors will notify customers of this program on their vehicle,"[25] and refers dealers to an attached customer letter, which is dated June 2008. The letter states that the condition may cause "rear wheel misalignment, resulting in lower tread depth on the inboard side of the rear tires."[26] Other than the two notices described, the Morgenstein Plaintiffs do not allege any actions by Old GM with respect to the Impalas (with or without Police Packages) between 2008 and the time Old GM filed for bankruptcy in 2009.

The Morgenstein Plaintiffs allege that once Old GM entered bankruptcy, they were "not listed by Debtors as creditors of the estate," despite Old GM's earlier treatment of allegedly "identically-situated Impala Owners."[27] The Morgenstein Plaintiffs further allege that Old GM "had a duty to list Plaintiffs as scheduled creditors," and "had a duty to disclose all material information, including the defective nature of Consumer Impalas."[28] As a result of these failures to disclose, the Morgenstein Plaintiffs allege, the "Debtor caused the Plan to be confirmed upon materially false information . . . ."[29] Finally, the Morgenstein Plaintiffs assert that both the disclosure statement and the schedules were "executed by attorneys" representing Old GM.[30]

---

[24]    Exhibit A, "Customer Notification."

[25]    *Id.*

[26]    Exhibit A, Letter to Customer.

[27]    Cmplt. ¶ 44.

[28]    Cmplt. ¶¶ 46-47.

[29]    Cmplt. ¶ 48.

[30]    *Id.*

The Complaint seeks revocation of the Confirmation Order to the extent that it "precludes Plaintiffs . . . from filing their claims, pursuing their rights, and otherwise taking appropriate action before this Court . . . ."[31]

Discussion

While the GUC Trust makes what in substance are five points in its papers, two address issues that can and should be heard at a later time, if they still matter then.[32] Only three need to be addressed now. In at least two of those respects, the Complaint is deficient, for reasons addressed below.

*(1)  Partial Revocation of a Confirmation Order*

The GUC Trust's first, and most fundamental, point is that a bankruptcy court has the power only to fully—and not partially—revoke a confirmation order entered under section 1144.  The Court agrees.

As usual,[33] the Court starts with textual analysis.  Section 1144 of the Code, upon which the Morgenstein Plaintiffs rely, provides, in full:

---

[31]    Cmplt. ¶ 53.

[32]    The others are (1) whether the Morgenstein Plaintiffs' claims may be heard, as late-filed claims, after the bar date has passed, and (2) whether they are amenable to class action treatment, under Fed.R.Civ.P. 23.  As resolved in a conference call before oral argument on the matters addressed in this decision, it is unnecessary to decide Rule 23 issues to decide the matters addressed here.

If the Confirmation Order can be revoked in part, on the one hand, or only in its entirety, on the other, either way that necessarily affects the entirety of Old GM's creditor community, and not just the affected class.  Either way, class certification is immaterial to whether such relief is available.  Many determinations made by a bankruptcy court in a chapter 11 case—even in contested matters, in the normal exercise of the bankruptcy court's in rem adjudication authority— affect the future of the chapter 11 case as a whole.  And many of those determinations thus have an inevitable effect on the parties as a whole.  But the fact that one party-in-interest or group of such parties can seek and obtain such relief does not mean that the party needs to seek or obtain class certification.  Under Fed.R.Bankr.P. 9014, Fed.R.Civ.P. 23 is not applicable in contested matters unless the Court otherwise directs.  Bankruptcy courts sometimes otherwise direct when certification of a purported class proof of claim is desired, but rarely if ever do so simply on the basis that a party-in-interest's request for a particular kind of relief impacts the estate as a whole, or affects many other people.

[33]    *See, e.g.*, *363 Sale Decision*, 407 B.R. at 486.

7

> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud.  An order under this section revoking an order of confirmation shall—
>
> > (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
> >
> > (2) revoke the discharge of the debtor.

Textual analysis strongly favors the GUC Trust.  Section 1144 authorizes the Court to "revoke *such order*," but it does not also say, in words or substance, that the revocation may be "in part."  The word "revoke," by its nature, is total, and absolute, a construction that is borne out by its definition, as derived from both legal[34] and lay[35] authorities.  Anything less would not be a revocation, but would instead be a modification, for which the Code has no provisions with respect to a confirmation order, but has separate provisions with respect to a plan, which could not be satisfied here.[36]  Nor does section 1144 say, in words or substance, that an order may be revoked with respect to any identified creditor, claim, or class of claims—one or more of which is what the Morgenstein Plaintiffs seek here.

---

[34] *See Black's Law Dictionary*, "Revoke" (6th Ed. 1990) ("To annul or make void by taking back. To cancel, rescind, repeal or reverse, as to revoke a license or will."); *accord id.* "Revocation" ("The withdrawal or recall of some power, authority, or thing granted, or a destroying or making void of some will, deed, or offer that had been valid until revoked.").

[35] *See Webster's Third Int'l Dictionary Unabridged*, "Revoke" (2000) ("to bring or call back"; "to annual by recalling or taking back (as something granted by a special act)"); *Merriam-Webster's Collegiate Dictionary*, "Revoke" (11th Ed. 2008) ("to annul by recalling or taking back, rescind").

[36] *See* Bankruptcy Code section 1127(b) ("The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.").  Here the Morgenstein Plaintiffs could not obtain modification of the Plan for at least the reasons that they are neither proponents of the plan nor the reorganized debtor, and that the Plan already has been substantially consummated.

8

Rather, section 1144 speaks to the order itself, which is understandable, since it would be the order as a whole that would be "procured by fraud."[37] Section 1144 simply does not say, as the Morgenstein Plaintiffs would need it to say, that the Court can cherry pick, or otherwise choose, the components of the confirmation order that the Court desires to revoke.

Nor is there anything ambiguous, in this Court's view (or, so far as the Court can tell in the view of any other court considering the matter), in section 1144's text or effect in this regard. As Judge Shannon observed in one of the very few cases wherein it was even argued that a partial revocation of a confirmation order was permissible:[38]

> The plain language of section 1144, however, only
> provides for revocation of an entire confirmation
> order.[39]

In argument going to textual analysis, or at least akin to it, the Morgenstein Plaintiffs argue, however, that section 1144(1), and the language leading into it, support their contention. The Court cannot agree. In fact, in the Court's view, that language cuts the other way.

The language upon which the Morgenstein Plaintiffs rely, which begins with a second sentence in section 1144, and then continues, provides:

---

[37]     Also, of course, the confirmation order blesses the implementation of an underlying plan, which is presented to (and voted upon by) creditors as a whole, and which frequently, if not also usually, involves compromises amongst creditors as to their respective entitlements.

[38]     *Paul H. Shield, MD, Inc. Profit Sharing Plan v. Northfield Laboratories Inc. (In re Northfield Laboratories Inc.)*, --- B.R. ---, 2010 Bankr. LEXIS 2635, 2010 WL 3417229 (Bankr. D. Del. Aug. 27, 2010) (Shannon, J.) ("***Northfield Labs***").

[39]     2010 Bankr. LEXIS 2635 at *12, 2010 WL 3417229 at *4. The Morgenstein Plaintiffs point out, properly, that in *Northfield Labs* Judge Shannon continued with a lengthier discussion of the subject, and that he ultimately did not need to, nor did he, rest his determination on the quoted language or the conclusion that partial revocation of a confirmation order was impermissible. (Further discussion of *Northfield Labs* appears at page 12 below.) They also point out that the views of judges outside this District and Circuit are not binding on this Court. Nevertheless, we here have the views of a highly respected judge who thought about the exact matter in question.

9

> An order under this section revoking an order of
> confirmation shall—
>
>> (1) contain such provisions as are
>> necessary to protect any entity acquiring
>> rights in good faith reliance on the order of
>> confirmation.

Without a doubt, the quoted language evidences recognition by Congress of the very

major consequences of the revocation of a confirmation order on anyone who might have

acquired rights in good faith reliance upon it, and directs bankruptcy courts to take

measures to address such concerns.  But the quoted language neither authorizes,

mentions, or even contemplates partial revocation of a confirmation order.[40]  Indeed, by

making reference to the order as a whole (in contrast to the portion of the order being

revoked), the quoted language once again underscores that it is the continuing existence

(*vel non*) of the order as a whole, rather than the order as modified, that necessitates the

protective provisions mentioned there.

Moving beyond textual analysis, the caselaw, to the extent it exists, once more

supports the GUC Trust's view.  As the GUC Trust observes, "only a handful of courts

have considered the issue."[41]  But those courts' conclusions have been consistent.  What

caselaw there is points in only one direction.

The clearest rejection of the notion that a confirmation order may be revoked in

part appears in *In re East Shoshone Hospital District*.[42]  There, in a chapter 9 case,[43]

---

[40]     Contrast, for example, this Court's analysis of section 1129(a)(4) of the Code, where, in *In re Adelphia Communications Corp.*, 441 B.R. 6, 13 (Bankr. S.D.N.Y. 2010), this Court held that while section 1129(a)(4) didn't *provide authorization* for the payment of fees sought by parties in that case, it *contemplated* such a possibility.  In section 1144, there is neither.

[41]     GUC Trust Br. at 9 (Adversary Proceeding ECF #20).

[42]     2000 WL 33712301 (Bankr. D. Idaho Apr. 27, 2000) (Myers, C.J.).

Chief Judge Myers rejected a contention that he could "partially" revoke confirmation in order to strike provisions of a plan. He stated, in that connection:

> § 901 incorporates by reference § 1144 which provides for revocation of an order of confirmation. The Debtor argues that it should be allowed to "partially" revoke confirmation in order to strike the plan provisions dealing with the Trust.
>
> There is nothing in the statute, nor has there been authority provided by the Debtor, which recognizes or validates a theory of selective or partial revocation of a chapter 9 plan. Either an order of confirmation is revoked or it is not.[44]

The Morgenstein Plaintiffs, while acknowledging what *East Shoshone Hospital District* says, argue that the quoted remarks were dictum. It is not clear to this Court that they are. They were the first observations articulated by Chief Judge Myers in his analysis of the topic, before he then went on to say that "[a]dditionally," section 1144 would limit revocation of a confirmation order to the 180 day period provided under that section (and thus the motion before him was untimely), and, in a footnote, that section 1144 would authorize revocation only on a showing of fraud, which there had not been made.[45] But even if his comments were dictum, they nevertheless are instructive, addressing the exact issue presented here.

Similarly, the Morgenstein Plaintiffs call into issue the GUC Trust's reliance on Judge Shannon's analysis of the topic in *Northfield Labs*, discussed above. The Morgenstein Plaintiffs are right in their point that the GUC Trust did not quote the

---

[43]    That distinction is not, however, meaningful. Section 901 of the Code (which lays out other provisions of the Code that are applicable in cases under chapter 9) includes among them section 1144. After noting that, Judge Myers went on to analyze section 1144. *Id.* at *4.

[44]    *Id.* (internal citations omitted).

[45]    *See id.* at *4 & n.10.

11

entirety of Judge Shannon's observations, and that on full reading, it should be
determined that he did not definitively decide the issue presented here.  But that is as far
as the distinction takes them.

      The entirety of Judge Shannon's observations on the subject was:

> Plaintiffs appear to request partial revocation of the
> Plan limited to "such portion of the Plan to reflect
> such subordination."  (Compl. 65).   The plain
> language of section 1144, however, only provides
> for revocation of an entire confirmation order.  It is
> unclear whether partial revocation is permissible
> pursuant to section 1144 and Plaintiffs have cited no
> case law in this regard.  Most importantly, however,
> Plaintiffs have failed to allege any facts showing
> that the Confirmation Order was procured by
> fraud.[46]

      When that language is read in its totality and in context, it is best read, in this
Court's view, to say that Judge Shannon thought it was doubtful that partial revocation
was permissible, but that he didn't need to decide the issue.  Nevertheless, the Court finds
his thinking helpful and instructive, as tending to reinforce (or at the very least not
contradict) the conclusions that would flow from textual analysis and *East Shoshone
Hospital District*.[47]

---

[46]      --- B.R. at ---, 2010 Bankr. LEXIS 2635 at *12, 2010 WL 3417229 at *4.

[47]      Other cases, dealing with the question presented here less expressly, likewise do not embody
holdings that would compel the conclusion for which the GUC Trust argues here, but nevertheless
tend to support the GUC Trust's view.  *See Almeroth v. Innovative Clinical Solutions, Ltd. (In re
Innovative Clinical Solutions, Ltd.)*, 302 B.R. 136, 143 (Bankr. D. Del. 2003) (Walsh, C.J.)
("***Innovative Clinical Solutions***") (denying motion to revoke confirmation order, principally on
grounds of equitable mootness, discussed below, but also rejecting notion that court could revoke
confirmation order, then ratify certain described transactions that had taken place under that
order's authority); *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 171 B.R. 666, 670
(Bankr. D. Ariz. 1994) (Nielsen, C.J.) ("***Circle K***") (likewise denying motion to revoke
confirmation order, principally on mootness grounds, rejecting notion that there could be a
scenario with quick revocation of discharge, amendment of the plan to the plaintiffs' satisfaction,
and reconfirmation of a new amended plan, observing that "[m]issing in this analysis is the fact
such procedure requires new disclosures and findings [that] the new or amended plan meets all
section 1129 elements.").

Against all of this, the Morgenstein Plaintiffs offer up no case that has ever held that a bankruptcy court can partially revoke an order of confirmation. The relevant authority, even if dictum, tips dramatically to the contrary.

The Morgenstein Plaintiffs further respond to the foregoing by saying that none of the cases discussed above are binding on this Court, even if not dictum. That of course is true. But this Court nevertheless cares very much about the views of its bankruptcy judge colleagues, in whatever district they sit, especially since they so well understand the way provisions of the Code fit together, and the context in which they issue their decisions.[48]

The Morgenstein Plaintiffs further contend, or at least imply, that they are not seeking "partial revocation," but instead are seeking "limited revocation," or "carefully crafted" revocation.[49] That is simply a play on words. Aside from the lack of distinction in any of the alternative euphemisms that the Morgenstein Plaintiffs choose to describe the relief they seek, the underlying goal, and problem, remains the same. The Morgenstein Plaintiffs (understandably) do not seek to revoke the Confirmation Order in its entirety, and the lesser relief they seek—even with the "carefully crafted" safeguards

---

[48]    In that connection, the Morgenstein Plaintiffs argue that the Court is *bound* by decisions of the Second Circuit, and that this Court's decision on this motion should be informed by a Second Circuit decision under the now-repealed Bankruptcy Act, *Seedman v. Friedman*, 132 F.2d 290 (2d Cir. 1942). *See* Morgenstein Plaintiffs' Br. (Adversary Proceeding ECF #26) at 22-23. Of course Second Circuit decisions are binding on the lower courts in this Circuit, whenever they are on point, and it is also true that cases decided under the old Act are not necessarily irrelevant, since the 1978 Bankruptcy Code in many respects carried over pre-Code law when it didn't reflect a contrary intent. But *Seedman* simply isn't on point. First, of course, we here must start with the words of the statute, and the Code specifies what the bankruptcy court can properly do and what it can't. Second, *Seedman*, which dealt with debts incurred after confirmation of Chapter XI arrangement, is properly read simply as an implementation of an approach that the second sentence of section 1144, and section 1144(1), codified—protecting those who might have relied in good faith on the thereafter revoked confirmation order. It says nothing about a court's right to partially revoke an arrangement even under the 1898 Bankruptcy Act, much less to partially revoke a plan under section 1144 of the Bankruptcy Code, enacted more than 35 years after *Seedman* came down.

[49]    *See* Morgenstein Plaintiffs' Br. at 23 ("As to Old GM's discussion of 'partial revocation,' the word 'partial' does not appear in the Complaint. The word 'limited' appears there; so does the verbiage 'carefully crafted' appear there, in ¶ 1.").

they say the Court should impose—cannot seriously be argued to be anything other than partial revocation.

Finally, the Morgenstein Plaintiffs have offered no persuasive reason to reject the views of the Court's colleagues in other districts, or to depart from the Court's inclination after textual analysis. "A confirmed plan takes on the attributes of a contract."[50] Though under the Code, unanimity of acceptance of a reorganization plan is not required, requisite levels of acceptance by affected classes (in both number and amount) must be obtained[51]—after disclosure, in detail, as to how affected parties will be treated, and what they should know. Though a contract (like an order confirming a reorganization plan) may be rescinded in its entirety because it was induced by fraud, modification of a contract only in part, without revoking it in whole, raises grave risks of upsetting the expectations of those who provided the necessary assents. Similar considerations apply to selective revocation of a confirmation order, as plans and confirmation orders typically work hand-in-hand in defining the stakeholders' rights.

The Complaint must be dismissed on the GUC Trust's first ground alone. A bankruptcy court cannot partially revoke a plan.

### (2) Fraud Upon the Court

Then, noting that fraud (which must be on the Court)[52] is the only basis upon which the Confirmation Order may be revoked, the GUC Trust further contends that here

---

[50]   *Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.)*, 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998); *In re Journal Register Co.*, 407 B.R. 520, 535-36 (Bankr. S.D.N.Y. 2009) (Gropper, J.) (quoting *Victory Markets*).

[51]   *See* Bankruptcy Code sections 1126(c), 1129(a)(7), 1129(a)(8), 1129(b)(1).

[52]   The Court does not understand the Morgenstein Plaintiffs to disagree that the fraud must be on the Court (as contrasted, *e.g.*, to fraud upon any other person or entity, such as consumers). *See e.g.*, *In re Longardner & Assoc., Inc.*, 855 F.2d 455, 460 (7th Cir. 1988) ("***Longardner***") (early in discussion affirming refusal to revoke chapter 11 plan, stating that "section 1144 expressly

14

fraud has not been satisfactorily alleged with the particularity Civil Rule 9(b) requires—
thus requiring dismissal of the Complaint for this additional reason as well.  The Court
agrees.

> Rule 9(b) provides:
>
>> In alleging fraud or mistake, a party must state with
>> particularity the circumstances constituting fraud or
>> mistake.  Malice, intent, knowledge, and other
>> conditions of a person's mind may be alleged
>> generally.

> Here the substance of the claim of fraud is that Old GM knew that the design
defect was in all of Old GM's 2007 and 2008 Impalas (and not just those that had the
Police Package), *and* that Old GM intended to defraud the *Court* by failing to disclose
that deficiency and make allowance for the resulting liability when Old GM confirmed a
plan of liquidation.  A variant is that Old GM had a duty to list the Morgenstein Plaintiffs
as scheduled creditors.  But the allegations underlying these claims fail to meet the
requirements of Fed.R.Civ.P. 8, much less the more stringent requirements of
Fed.R.Civ.P. 9(b).[53]

---

allowed the bankruptcy court to revoke its March 7 order confirming the reorganization plan, if the
creditor had met the prerequisite of showing that *the court* was defrauded.") (emphasis added);
*accord id.* at 461 (considering whether debtor was "engaging in a fraud upon the court") (internal
quotation marks omitted); *Skulsky v. Nyack Autopartstores Holding Co., Inc. (In re Nyack
Autopartstores Holding Co., Inc.)*, 98 B.R. 659, 661 (Bankr. S.D.N.Y. 1989) (Schwartzberg, J.)
("***Nyack Holding Co.***") (dismissing complaint seeking revocation of confirmation order because
facts pleaded "[did] not reflect the debtors' intent to defraud the court or particularize any
fraudulent intent on the part of the debtors."); *id.* at 662 ("The creditor does not, however, offer
any evidence of the debtor's intent to defraud the court.").

[53]    Even under Rule 8, factual allegations must be plausible.  *Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007) ("***Twombly***"); *Iqbal*, 556 U.S. at ---, 129 S. Ct. at
1949.  They also "must be enough to raise a right to relief above the speculative level."  *Twombly*,
550 U.S. at 555; *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of America)*, 399 B.R.
722, 741 (Bankr. S.D.N.Y. 2009) (Gerber, J.) (quoting *Twombly*).

To secure relief under section 1144 of the Code, a movant must point to specific acts of the debtor evidencing actual fraudulent intent.[54] Here sufficient allegations of that character are lacking.

Initially, the Court must observe that the allegations that Old GM knew of the design defect with respect to 2007 and 2008 Impalas generally are conclusory statements, supported by no evidentiary facts. Of course, the Morgenstein Plaintiffs ask the Court to draw an inference that Old GM knew, because of an alleged lack of material difference in the design of Impalas' rear wheel spindle rods between those with the Police Package and those without, but without more this is in substance a claim that Old GM *should have known* that the alleged design defect was more widespread. That might support allegations of negligent misrepresentation (assuming a misrepresentation or duty to speak), but without more it does not support allegations of fraud, especially a fraud upon the Court. No facts are set forth establishing that Old GM actually knew the defect was more widespread. Nor are facts alleged evidencing a decision by the Debtors to deny notice to any of the named plaintiffs, or, for that matter, the 400,000 or so owners of 2007 and 2008 Impalas.[55] Inference, without more, is insufficient.[56]

Though under Rule 9(b), intent may be alleged generally, it still is necessary "to allege facts that give rise to a strong inference of fraudulent intent."[57] Since Rule 9(b) is

---

[54]    *Longardner*, 855 F.2d at 461 (Section 1144 does not define "fraud," but "[i]t is fair to say, however, that the courts require a showing of *actual fraudulent intent*.") (emphasis added).

[55]    Of course, the Debtors did provide notice by publication.

[56]    *See Nyack Holding Co.*, 98 B.R. at 662 ("Indeed, if fraud must be inferred from the language in the complaint in order to support a claim for revocation, the complaint must be regarded as legally insufficient because it fails to particularize the fraudulent conduct committed by the proponent of the plan. Fraud should not be inferred; the circumstances constituting the alleged fraud must be stated with particularity.").

[57]    *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("**Citytrust Bancorp**").

16

intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a

defendant's reputation from improvident charges of wrongdoing, and to protect a

defendant against the institution of a strike suit,"[58] the relaxation of Rule 9(b)'s

specificity requirement for scienter "'must not be mistaken for license to base claims of

fraud on speculation and conclusory allegations.'"[59]  To serve the purposes of Rule 9(b),

the Second Circuit thus requires plaintiffs to allege facts that give rise to a strong

inference of fraudulent intent.[60]

    The requisite "strong inference" of fraud may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.[61]  Here the Court finds neither.

    With respect to the first alternative basis, Old GM's "motive and opportunity," the

Court does not need to decide whether a company *continuing in business* would be

defrauding *its consumers* if it knew of, but failed to address, the alleged design defect.

Here, where a company was liquidating and the necessary fraud must be shown to have

been upon the Court, motive and opportunity (and especially the former) were lacking.

We here had a plan of liquidation; Old GM would not survive.  It would simply be taking

whatever assets it had and distributing them, *pari passu*, to its creditors.  If Old GM had

known of, and disclosed, the design defect that is alleged, it would have (or at least could

---

[58]      *Id.*, quoting *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991),
          and *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).  To this can be added, in
          the chapter 11 context when revocation of a plan is sought on grounds of fraud, the protection of
          innocent creditors, who have a strong interest in the binding effect of reorganization plans.

[59]      *Id.*

[60]      *Id.*

[61]      *Id.*

have) put up for confirmation the exact same liquidation plan, and the plan would have

been just as feasible.  If a class claim had been disclosed and ultimately allowed (or

reserved for), individual creditors' *pari passu* shares of the available pot would have been

less, of course (and that no doubt would have been of concern to them), but neither the

Plan, nor any judicial action by this Court, would be any different.  The Court can find no

motive.[62]

Though technically speaking, any plan proponent putting forward a plan for

confirmation has an "opportunity" to defraud the Court, in this context "opportunity"

must mean something more.  It should mean a juncture in the case where the plan

proponent reaches the decision point (or "opportunity") to present a plan that would not

defraud the Court, and elects not to do it.  Here that too is lacking.

With respect to the second alternative basis, "strong circumstantial evidence of

conscious misbehavior or recklessness," the necessary allegations likewise are lacking.

There are no facts alleged that give rise to the inference that Old GM had an intent to

keep facts from the Court of which Old GM was aware.[63]  Allegations of this character,

---

[62]     Nor, in fact, can the Court, after *Twombly* and *Iqbal* (each of which was decided after *Citytrust Bancorp*), even find the allegations of fraud plausible, under Rule 8 doctrine.  It simply is not plausible that a debtor would seek to defraud the Court under these circumstances (even putting aside the fact that this chapter 11 case was in a goldfish bowl), when doing so would make no difference to Old GM whatever.  Old GM was liquidating, not continuing in business.  Claims of fraud against even the consumer community are not plausible, not to mention a fraud against the Court.  There would be no motivation to conceal the design defect even if Old GM knew about it, as Old GM would be giving everything it had to its creditor community, with or without the Morgenstein Plaintiffs' additional claim.

[63]     At various points in their papers, the Morgenstein Plaintiffs seem to suggest that the fact that Old GM acted through attorneys helps elevate their contentions to fraud on the Court.  The Court manifestly disagrees.  Attorneys serve clients in the overwhelming majority of chapter 11 cases, and that fact, without much more, does not rise to the level of fraud on the Court.

18

as previously noted, are essential, because, as previously noted,[64] the fraud must be on the *Court*, and not directed at anyone else or floating in the air.

There are no facts alleged suggesting that Old GM creditors, who overwhelmingly voted to support the Plan,[65] would have voted differently in the absence of the alleged fraud—a consideration that Judge Hardin of this Court found significant in addressing a similar request for section 1144 relief to advance a private agenda.[66] Likewise, there are no facts alleged supporting a conclusion that Old GM made a decision not to give notice to Morgenstein, Jacob or Carpenter (or other 2007 and 2008 Chevy Impala owners), or

---

[64]    *See* n.52 *supra*.

[65]    As the Court noted in the *Confirmation Decision*, *see* n.1 *supra*, 447 B.R. at 201 & n.3, the Plan was "very popular with Old GM's creditors, having secured the approval of 97% of them in number, and 85% in dollar amount," and was approved by 97.8%, in each of number and amount, of the class of asbestos injury claimants, the Debtors' other major unsecured creditor class. None of them joined in the Morgenstein Plaintiffs' motion to revoke the confirmation order, or otherwise indicated that they considered the confirmation order to have been procured by fraud.

[66]    *See Varde Investment Partners, L.P. v. Comair, Inc. (In re Delta Airlines, Inc.)*, 386 B.R. 518 (Bankr. S.D.N.Y. 2008) (Hardin, J.) ("**Delta Airlines**"). As Judge Hardin there stated:

> Because the court is bound by the votes of creditors when issuing its confirmation order, in order to demonstrate that the confirmation order was procured by fraud it should be shown that at least some of the creditors would have voted differently absent the alleged fraud. While there is no way to know for certain whether the required majority of creditors would have voted in favor of the plan absent the fraud, it is instructive to consider which parties have seen fit to join the suit for plan revocation. If a substantial number of the creditors who voted in favor of a plan bring suit to revoke the plan on the grounds that they were defrauded into voting for it, this should influence a court to exercise its discretion to revoke the plan if it finds that the plan was fraudulently procured.
>
> Conversely, in cases like this one, where none of the plaintiffs seeking to revoke the plan appear to have had the right to vote on confirmation, and none of the voting creditors who were allegedly defrauded into voting for confirmation have joined in or supported the suit to revoke the plan, the court should be cautious in exercising its discretion to revoke the confirmation order.

386 B.R. at 533-534.

19

not to list them as creditors of the Old GM estate, or even that Old GM regarded them as creditors of the Old GM estate, to whom it would not give notice.

Thus this case has marked similarity to *Spiegel*,[67] where Judge Lifland dismissed a complaint premised on conclusory statements that the complainants were known creditors of the chapter 11 debtor.[68]

Thus the Complaint must also be dismissed for its deficiencies in pleading a fraud upon the Court.

*(3)  Equitable Mootness*

The GUC Trust also moves to dismiss on a third ground, equitable mootness, in light of the Debtors' earlier distribution, under the confirmed Plan (which went effective in March 2011, many months ago),[69] of millions of publicly traded shares and warrants of New GM, and the continuous trading of those securities since that time.

The equitable mootness prong of the GUC Trust's dismissal motion is not the slam dunk it once was[70]—by reason of the Morgenstein Plaintiffs' statement to this Court

---

[67]    *See* n.8 *supra.*

[68]    *See* 354 B.R. at 55-57 (also noting that the debtors "[were] not required to employ a crystal ball when one complaint [was] filed to determine whether any other similar claims exist"; that "[e]veryone who may conceivably have a claim is not entitled to actual notice, rather publication notice is sufficient for creditors who are not reasonably ascertainable"; and that "[e]fforts beyond a careful examination of the Debtors books and records are generally not required.").

      *See also In re D.F.D. Inc.*, 43 B.R. 393, 395 (Bankr. E.D. Pa. 1984) (Goldhaber, C.J.) (denying motion to revoke confirmation order based on alleged fraud predicated on an allegation that the debtor knowingly failed to list a creditor on its schedules, where evidence was lacking that the debtor had fraudulently done so, and claimant could have obviated the issue by the expedient of filing a proof of claim or a request for notices).

[69]    On April 6, 2011, Wilmington Trust Company, the Administrator of the GUC Trust, filed notice that the Plan became effective on March 31, 2011 (the "**Effective Date**").  *See* Umbrella Case ECF #10,056.

[70]    *See Delta Airlines*, 386 B.R. at 535 (dismissing an action to revoke a plan where thousands of transactions, involving billions of dollars, had been negotiated and executed based upon the debtors' joint plan, describing these transactions as a "vast omelette which cannot be unscrambled").

at oral argument, after the GUC Trust filed its motion, that they would not seek to make the holders of those securities give them back.[71]  But apart from the fairness concerns that would result even from the Morgenstein Plaintiffs' modified requested relief, mootness concerns may very well still exist, because (the Court suspects but is not in a position yet to find that) hundreds of thousands (or more) of shares and warrants, with a value of many millions (or more) of dollars, traded since the Plan became effective, having been bought and sold based on estimates of Plan recoveries premised on the claims mix at the time the Plan was confirmed.

It is very possible that—even if those who already received stock and warrants under the Plan weren't required to give back what they already received—all of the trading that took place after entry of the Confirmation Order (in what probably was in reliance on the Plan and Confirmation Order as then entered, and the related Disclosure Statement as then approved) by itself would support a finding of equitable mootness.  But the evidence of the nature and extent of the trading after the Plan's Effective Date, the understandings on which it took place, and remaining resources to satisfy late filed claims if allowed is thin on this motion, and goes beyond what courts normally consider on

---

As Judge Hardin also noted in *Delta Airlines*, whether to revoke a confirmation order under section 1144 rests in the sound discretion of the court.  386 B.R. at 532.  "[T]he court may decline to revoke an order of confirmation *even if* it finds that the order was procured by fraud."  *Id.* (emphasis in original).  Thus this Court might well conclude that the underlying unfairness to other creditors; serious, but not definitively established, equitable mootness concerns; and/or concerns on the part of the movants that are very different from those of the overwhelming majority of creditors who voted to support the Plan, see *id.* at 529, might warrant a determination declining to revoke the Confirmation Order here, even partially, even if this Court denied the motion to dismiss the Morgenstein Plaintiffs' claims.  The Court does not need to decide that now.

[71]  Instead, the Morgenstein Plaintiffs would presumably hold up the future distributions to Old GM's other creditors (who, the Court was informed, have received approximately 80% of the New GM securities that the GUC Trust would have to distribute to unsecured creditors) until the Court could determine that the Morgenstein Plaintiffs' claim should be allowed, and in what amount—with the Morgenstein Plaintiffs getting the sole distributions from the remaining New GM stock until they could catch up—with the Debtors' other creditors suffering both the delay and the dilution that would result from such an approach.

motions under 12(b)(6).[72]  Under Fed.R.Civ.P. 12(d), that evidence is more appropriately

considered on a motion under Rule 56.  Thus dismissal under this prong of the GUC

Trust's motion is denied without prejudice, in the event that it ever matters in light of the

Court's dismissal of the Morgenstein Plaintiffs' Complaint under the first two bases upon

which the GUC Trust moved.

Conclusion

For the foregoing reasons, the motion to dismiss is granted.[73]  Concurrently with

the issuance of this Decision and Order, the Court is issuing a separate stand-alone

judgment, pursuant to Fed.R.Bankr.P. 7058 and Fed.R.Civ.P. 58, denying the relief

sought in the Complaint.[74]

SO ORDERED.

Dated:  New York, New York                            _s/Robert E. Gerber_____
        January 18, 2012                            United States Bankruptcy Judge

---

[72]    Many of the facts giving rise to the equitable mootness concerns do not appear from the face of the
        Morgenstein Plaintiffs' Complaint, or documents the plaintiffs incorporated in the Complaint or as
        to which they can be charged with notice—raising issues as to whether these concerns could be
        heard under Fed.R.Civ.P. 12(b)(6) or must be considered in a summary judgment motion, under
        Rule 56.  Fed.R.Civ.P. 12(d) provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside
> the pleadings are presented to and not excluded by the court,
> the motion must be treated as one for summary judgment
> under Rule 56.  All parties must be given a reasonable
> opportunity to present all the material that is pertinent to the
> motion.

The Morgenstein Plaintiffs raised no objection to the GUC Trust's presentation of facts outside the
pleadings that were relevant to mootness, and did not request the opportunity to present any facts
they might adduce that would be outside the pleadings, as authorized under Fed.R.Civ.P. 12(d).
Nevertheless, the Court considers it preferable, whether or not such is required, to defer
consideration of the evidentiary facts suggesting equitable mootness until a later time, if it ever
becomes necessary.

[73]    In their brief, the Morgenstein Plaintiffs make a belated request to replead.  *See* Morgenstein
        Plaintiffs' Br. at 53, n.74.  The Court denies that relief because of the legal deficiency underlying
        the first ground for dismissal, and because the need to put forward facts was apparent long ago.

[74]    The Court elects, pursuant to Fed.R.Civ.P. 7058(b)(1), to prepare and sign the judgment itself,
        rather than to have the Clerk do so under Fed.R.Civ.P. 58(b)(1)(C).  The time to appeal from the
        judgment will run from the date of its entry.